**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Austin Neeley, et al., | No. CV-19-05899-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

Pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 111). Plaintiffs Austin Neeley[1], Brittany Robinette, V.S.R., A.L.N., and A.R.N. ("Plaintiffs") have filed a Response in opposition (Doc. 113), and Defendants filed a Reply (Doc. 115).

**I.   Background**

This case stems from the removal of Plaintiffs V.S.R., A.L.N., and A.R.N. from their home by Arizona Department of Child Safety ("DCS") employees and the subsequent juvenile protection proceedings. (Doc. 105 at ¶ 38). On June 15, 2021, Plaintiffs filed their Second Amended Complaint ("SAC"), alleging 15 claims against various Defendants, including DCS and several of its employees, the State of Arizona, and spouses of several Defendants. (*Id.* at ¶¶ 14–31).

Counts 1–4, 11, and possibly 12[2] involve claims for 42 U.S.C. §1983 violations.

---

[1] Mr. Neeley is the biological father of A.L.N. and A.R.N., but not V.S.R. (Doc. 105 at ¶ 36).

[2] Count 12, styled as a Due Process claim, does not specify if it arises under the Arizona or

(Doc. 105). Count 15 involves a civil conspiracy claim under 42 U.S.C. § 1985(3). (*Id.*) Counts 5–10, and 14 involve various claims of state law violations. (*Id.*) Count 13 involves "*Monell*-related claims" against DCS. (*Id.*)

Defendants move to dismiss Counts 5–10, 14, and 15 with prejudice for failing to file a timely notice of claim as required by Arizona's Notice of Claim Statute, A.R.S. § 12-820.01. (Doc. 111 at 2). Defendants contend these causes of action undisputedly accrued more than 180 days ago, and therefore the dismissal should be with prejudice because any further amendment would be futile. (*Id.*) Defendants also move to dismiss DCS as a Defendant. (*Id.*)

## II.     Legal Standards

A motion to dismiss pursuant to Rule 12(b)(6) challenges the legal sufficiency of a complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199–1200 (9th Cir. 2003). A complaint need not contain detailed factual allegations to avoid a Rule 12(b)(6) dismissal; it simply must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S., at 570. "A complaint has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S., at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (citation omitted).

In addition, the Court must interpret the facts alleged in the complaint in the light most favorable to the plaintiff, while also accepting all well-pleaded factual allegations as true. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). That rule does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678. A complaint that provides "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not

---

the United States Constitution. This is one of the many vagaries in Plaintiffs' Complaint.

do." *Twombly*, 550 U.S. at 555. Nor will a complaint suffice if it presents nothing more than "naked assertions" without "further factual enhancement." *Id.* at 557.

**III.   Analysis**

   **A. Plaintiff Robinette's State Law Claims**

At the outset, Plaintiffs concede that the time to file a NOC has expired for any state claims brought by Plaintiffs Mr. Neeley and Ms. Robinette for damages resulting from minor Plaintiffs A.L.N. and A.R.N.'s removals.[3] (Doc. 33 at 3). Counts 5–10, and 14, brought by Plaintiffs Mr. Neeley and Ms. Robinette for damages resulting from minor Plaintiffs A.L.N. and A.R.N., are therefore dismissed.[4] In their Response, Plaintiffs only argue that Plaintiff Brittany Robinette's ("Plaintiff Robinette") state law claims are timely.[5] (Doc. 113). The Court will accordingly focus on when Plaintiff Robinette's state law claims pertinent to V.R.S. accrued.

In that regard, Plaintiff Robinette's state law claims are as follows:

   **i.   Count 5—Abuse of Process**

Plaintiff Robinette argues Ms. Bennett, Ms. McGlynn, Ms. Ashmore, Ms. Mitchum, Ms. Cooper, and/or Ms. Janowitz committed abuse of process "when they refused to return V.S.R., A.L.N., and A.R.N. to the custody of Mr. Neeley and/or Ms. Robinette even though they knew there was no probable cause to continue to detain those children." (Doc. 105 at ¶ 227). She further claims Defendants "used the court process to keep V.S.R., A.L.N., and A.R.N away from their parents in a fashion inconsistent with the legitimate litigation goal of protecting children." (*Id.* at ¶ 228). Plaintiff Robinette then raises specific allegations against Ms. Ashmore, arguing she "continu[ed] the judicial process in a fashion inconsistent with the legitimate litigation goal of protecting children when she told Mr.

---

[3] Although Plaintiffs stated they "intend to delete those claims from an amended complaint, and/or voluntarily dismiss them pursuant to FRCP 41," they have not done either. Indeed, Plaintiffs' SAC still incorporates these allegations. (Doc. 105).

[4] In the future, when the parties reach agreement on the viability or non-viability of claims, they are directed to promptly file a stipulation to dismiss and/or seek leave to amend the operative pleadings.

[5] The Response was filed by "Plaintiffs" but the claims at issue here concern only Plaintiff Robinette.

Neeley, Ms. Robinette, and Ms. Dale that the judge and the State's attorney were not in charge of what happened to the children, but that she was." (*Id.* at ¶ 229). She further argues Ms. Ashmore acted "in a fashion inconsistent with the legitimate litigation goal of protecting children when she told Mr. Neeley, Ms. Robinette, and Ms. Dale that V.S.R., A.L.N., and A.R.N. would have been returned home sooner if Mr. Neeley and Ms. Robinette had not retained private counsel." (*Id.* at ¶ 230). Thus, Plaintiff Robinette argues "[a]s a direct and proximate result of Ms. Bennett, Ms. McGlynn, Ms. Ashmore, Ms. Mitchum, Ms. Cooper, and/or Ms. Janowitz's abuse of process, Plaintiffs suffered and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial." (*Id.* at ¶ 231).

### ii. Count 6—Gross Negligence re: Preserving Family

Plaintiff Robinette argues Ms. Bennett, Ms. McGlynn, Ms. Ashmore, Ms. Mitchum, Ms. Cooper, and Ms. Janowitz committed gross negligence in carrying out their duty to make reasonable efforts to preserve the family relationship when they failed to provide information to Ms. Robinette and Mr. Neeley prior to the November 3, 2016, dependency hearing. (*Id.* at ¶ 234). She further claims Defendants committed gross negligence when (1) "they provided Ms. Robinette and Mr. Neeley with only one visit with A.L.N. and A.R.N. during the first ninety (90) days after the children were seized; (2) when they refused to provide visitation between Ms. Robinette and V.S.R. during the first 198 days after V.S.R. was seized; (3) when they failed to provide any reunification services until six (6) months after the children were seized. (*Id.* at ¶¶ 235, 236, 237).

She also argues Defendants committed gross negligence when (1) "they consistently attempted to prevent or halt visitation between Ms. Robinette and V.S.R., resulting in V.S.R. only seeing her mother for 69.5 hours over the 1,082 days that V.S.R. was in State custody. V.S.R. was restricted from seeing her mother without good cause for a total of 925 days while she was in State custody; (2) when they consistently attempted to prevent or halt visitation between A.L.N., A.R.N, and V.S.R. without good cause; (3) lied to the court regarding the status of the case and the status of Mr. Neeley's and Ms. Robinette's

progress and/or psychological evaluations." (*Id.* at ¶¶ 238, 239, 240). Thus, Plaintiff Robinette contends "[a]s a direct and proximate result of Ms. Bennett's, Ms. McGlynn's, Ms. Ashmore's, Ms. Mitchum's, Ms. Cooper's, and Ms. Janowitz's breach of their duty of care, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial." (*Id.* at ¶ 241).

### iii. Count 7—Gross Negligence re: Legal Rights of Children and Family

Because these allegations are identical to the allegations above, the Court will not restate them.

### iv. Count 8—Intentional Infliction of Emotional Distress

Plaintiff Robinette argues Ms. Ashmore, Ms. Cooper, Ms. Thomas, and/or Dr. De Soler committed intentional infliction of emotional distress when they kept V.S.R. from Ms. Robinette "for extended periods of time, including two periods of almost a year, either without visitation or with only one visit." (*Id.* at ¶ 253). She further claims Ms. Ashmore and/or Ms. Thomas "both acted with either intent to cause emotional distress or recklessly disregarded the near certainty that such distress would result from their conduct when they (1) restricted visits between V.S.R. and her family, even though they knew that V.S.R. became so upset after her visits with Ms. Robinette were suspended that V.S.R.'s foster family called the police due to V.S.R.'s behavior [and] when they restricted V.S.R.'s visits with Ms. Robinette, A.L.N., and A.R.N., even though they knew that V.S.R. feared her family members were dead when the visits were restricted. (*Id.* at ¶¶ 254, 255).

She also argues Ms. Cooper, and/or Dr. De Soler committed intentional infliction of emotional distress "when they knew that V.S.R.'s psychological hospitalization was a direct result of their decision to restrict V.S.R. from visiting with Ms. Robinette and A.L.N. and A.R.N., but yet they intentionally persisted in denying V.S.R. visitation or contact with Ms. Robinette for numerous extended periods of time, up to a year at a time." (*Id.* at ¶ 257). Finally, she alleges Rose Blackburn and Deloria Blackburn committed intentional infliction of emotional distress "when they inculcated in V.S.R., among other false facts

and narratives, the false narrative that V.S.R. was sexually abused by Plaintiff Neeley in order to alienate V.S.R. from her family and support a cessation and/or denial of visitation with her family, and/or a change in the placement plan from family reunification to severance and adoption so that they could adopt V.S.R.  (*Id.* at ¶ 258).  Plaintiff alleges "V.S.R. continued to suffer such severe emotional distress from the actions of Ms. Ashmore, Ms. Thomas, Ms. Cooper, Rose Blackburn and Deloria Blackburn, and/or Dr. De Soler that in February 2019, it was thought V.S.R. would have to be institutionalized." (*Id.* at ¶ 260).

Thus, Plaintiff Robinette contends "[a]s a direct and proximate result of Ms. Bennett's, Ms. Ashmore's, Ms. Cooper's, Ms. Thomas's, Rose Blackburn and Deloria Blackburn's, and/or Dr. De Soler's actions, V.S.R. suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial."  (*Id.* at ¶ 262).

### v.   Count 9—Medical Malpractice

Plaintiff Robinette argues Ms. Thomas and/or Dr. De Soler[6] committed medical malpractice when "they failed to provide the minimum accepted standard of care in their treatment of V.S.R."  (*Id.* at ¶ 265).  Plaintiff Robinette thus contends "[a]s a direct and proximate result of Ms. Thomas's, and/or Dr. De Soler's failure to satisfy the minimum accepted standard of care, V.S.R. suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial."  (*Id.* at ¶ 266).

### vi.   Count 10—Negligent Hiring, Training, Supervision, and Retention

Plaintiff Robinette argues Defendants State of Arizona, McKay, Grossman & Grossman, Ltd., and Dr. Heather De Soler, PLLC were negligent in hiring, training, supervising, and retaining employees.  (*Id.* at ¶ 269).  She argues Defendants State of Arizona and McKay "owed a duty to Plaintiffs to ensure their employees, officers, and

---

[6] According to A.R.S. § 12-561, a medical malpractice claim in Arizona can only be brought against a licensed health care provider.  In Count 9, Plaintiff Robinette names Ms. Thomas and Dr. De Soler.  The Court notes, however, that this claim only applies to Ms. Thomas if she qualifies as a licensed health care provider.

agents were qualified to serve in their respective roles before hiring and assigning employees to act as investigators and/or case managers for DCS [and] to ensure that their employees, officers, and agents were properly trained and possessed the skill and knowledge to perform their assigned job tasks in a competent manner." (*Id.* at ¶ 268, 269).

She makes the same arguments against Defendants Grossman & Grossman and Dr. Heather De Soler, PLLC, who were under contract with DCS. (*Id.* at ¶ 270–273).

Thus, Plaintiff Robinette contends, "[a]s a direct and proximate result of Defendants' breaches of these duties, Plaintiffs were damaged in that they, among other things, were denied their constitutionally protected individual and familial rights thereby suffering damages from the loss of familial relationships for extended periods of time during formative times in the lives of the children and the family, and Plaintiffs will continue to suffer such damages into the future, all in an amount that will be demonstrated at trial." (*Id.* at ¶ 275).

### vii. Count 14—Civil Conspiracy

Plaintiff Robinette alleges DCS Defendants, Ms. Thomas, and the Blackburns committed civil conspiracy when they "me[]t, conferred, and/or communicated on a regular basis regarding V.S.R.'s placement and changing the placement plan from reunification to severance and adoption, including without limitation, agreeing on a plan to inculcate in V.S.R. negative and false facts and narratives regarding her mother and Defendant Neeley. (*Id.* at ¶ 306). She further claims "Ms. Thomas allowed the Blackburns to be present at and participate in therapeutic counseling of V.S.R. in their foster home in furtherance of their agreement to facilitate a change in placement objectives from family reunification to severance and adoption [and] the DCS Defendants kept the Blackburns informed of services and juvenile court proceedings which the juvenile court specifically instructed the Blackburns were to not be informed about, all in furtherance of the agreement to facilitate a change in placement objectives from family reunification to severance and adoption." (*Id.* at ¶¶ 307, 308).

She also argues Defendants Bennett, McGlynn, Ashmore, Mitchum, Cooper, and

Janowitz "either singularly or jointly acted, and/or conspired, to deliberately or recklessly present false statements and/or omit known exculpatory omissions material in the juvenile dependency petition, reports, and/or motions filed in the Juvenile Court. This deceptive conduct caused V.S.R.'s, A.L.N.'s and A.R.N.'s continued and prolonged detention from their parents care, custody, and/or control." (*Id.* at ¶ 309). Specifically, she alleges "Defendants represented to the juvenile court that Plaintiffs Neeley and Robinette were under police investigation for child abuse long after the Apache Junction Police Department had closed its investigation and "cleared" the parents of criminal suspicion without referring any criminal charges of child abuse against them in order to justify the State's motion to continue its physical custody of the minor Plaintiffs. Similarly, but also without limitation, Defendants Bennett, McGlynn, Ashmore, Mitchum, Cooper, Janowitz, and each of them, continued to file documents with the juvenile court asserting that Plaintiff Neeley had sexually abused V.S.R. long after both polygraph and psychosexual testing confirmed that Plaintiff Neeley had not sexually abused V.S.R. as a means of preventing the swift reunification of this family and as a means of preventing, stopping, and/or delaying parental visitations with V.S.R." (*Id.* at ¶ 310).

Thus, Plaintiff Robinette contends "[t]he acts alleged herein constitute a civil conspiracy in that two or more of the Defendants knew of the State's obligation to reunite this family, of the juvenile court's order to not inform the Blackburn's of ongoing therapy objectives and juvenile court proceedings, among other things, and all agreed to take actions to facilitate a change of placement objectives from family reunification to severance and adoption – the underlying torts being negligent failure to protect, negligence per se, and intentional infliction of emotional distress. (*Id.* at ¶ 311).

In their Motion, Defendants argue Plaintiff Robinette's state law claims accrued—at the latest—on September 13, 2019, when V.S.R. was returned to Plaintiff Robinette's care, because at that time she was on notice of Defendants' alleged harms. (Doc. 111 at 6). Defendants thus argue that the last day for Plaintiff Robinette to have filed a timely NOC was on or before March 11, 2020, making Plaintiff Robinette's June 15, 2020 NOC

untimely. (Doc. 111 at 6–7 (citing Doc. 113-2 at 2)). Defendants also argue that Plaintiff Robinette failed to even file her notice of claim prior to filing this lawsuit, thereby undermining the very purpose of the NOC statute. (Doc. 111 at 5).

In response, relying on *McDonough v. Smith*, 139 S. Ct. 2149 (2019), Plaintiff Robinette alleges that none of the state law claims accrued until V.S.R.'s dependency proceedings ended on January 29, 2020. (Doc. 113 at 6). Because she filed her NOC on June 15, 2020, Plaintiff Robinette argues she was within the 180-day deadline. (*Id.*) Plaintiff Robinette further contends the filing of an amended complaint resets the time for proper filing of a NOC and thus the claims should not be dismissed because the lawsuit was filed before the NOC. (Doc. 113 at 7). She argues Defendants ignore that Plaintiff Robinette filed both the First Amended Complaint (Doc. 47) ("FAC") and the SAC after serving their NOC on June 15, 2020. (*Id.*)

In their Reply, Defendants counter that Plaintiff Robinette failed to provide any authority to support the contention that an amended complaint resets the time to file a NOC, and that the amended complaints "relate back to the original Complaint and therefore are not properly supported by the required notice of claim." (Doc. 115 at 3).

The Court will address each of these arguments in turn.

### B. Notice of Claim

Arizona law requires that before filing a lawsuit alleging state law causes of action against a public entity, school, or employee, a plaintiff must individually serve each public defendant with a notice of claim ("NOC") within 180 days of when the cause of action accrued. *See* A.R.S. § 12-821.01(A); *Harris v. Cochise Health Sys.*, 160 P.3d 223, 230 (Ariz. Ct. App. 2007) ("When a person asserts claims against a public entity and a public employee, the person 'must give notice of the claim to both the employee individually and his employer.'") (quoting *Crum v. Super. Ct.*, 922 P.2d 316, 317 (Ariz. Ct. App. 1996)). "The purpose of the statute is to allow the entity and employee the opportunity to investigate and assess their liability, to permit the possibility of settlement prior to litigation and to assist the public entity in financial planning and budgeting." *Crum*, 922 P.2d at 351.

Here, the issue of whether Plaintiff Robinette's[7] claims are timely turns on when the various causes of action accrued. "A cause of action accrues when the damaged party realizes he or she has been damaged and knows or reasonably should know the cause, source, act, event, instrumentality or condition which caused or contributed to the damage." A.R.S. § 12-821.01(B). In Arizona, the term "accrual" is construed in accordance with the common law discovery rule, which "provides that a cause of action accrues when a plaintiff discovers or reasonably should have discovered the injury was caused by the defendant's [tortious] conduct." *Stulce v. Salt River Project Agric. Improvement & Power Dist.*, 3 P.3d 1007, 1010 (Ariz. Ct. App. 1999). "It is not enough that a plaintiff comprehends the 'what'; there must also be a reason to connect the 'what' to a particular 'who' in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault." *Walk v. Ring*, 44 P.3d 990, 996 (Ariz. 2002).

### C. Accrual of Claims

Generally, accrual is a factual question for the jury to determine and cannot be decided as a matter of law. *Humphrey v. State*, 466 P.3d 368, 375 (Ariz. Ct. App. 2020). The rule does not apply, however, when there is no genuine dispute as to the facts showing the plaintiff knew or should have known the basis for the claim, such as the case here. *Id.* The Court will therefore address Plaintiff Robinette's argument that regardless of the discovery rule, the Court should find that the statute of limitations for her state law claims started only after V.S.R.'s dependency proceedings concluded.

### i. *McDonough v. Smith*

Plaintiff Robinette cites *McDonough v. Smith* to support her contention that the state law claims did not accrue until V.S.R.'s dependency proceedings ended on January 29, 2020. 139 S. Ct. at 2158. In *McDonough*, the plaintiff brought a claim for malicious prosecution under § 1983 against various defendants. *Id.* at 2149. The Court held the statute of limitations for plaintiff's fabricated-evidence claim "began to run when the criminal proceedings against him terminated in his favor . . . not when the evidence was

---

[7] A.R.S. § 12-821.01(A) does not apply to minors. *See* A.R.S. § 12-821.01(D).

- 10 -

used against him." (*Id.*) According to the Court, if the claim accrued at any other time, it "would impose a ticking limitations clock on criminal defendants as soon as they become aware that fabricated evidence has been used against them." *Id.* at 2158. "Such a rule," the Court noted, "would create practical problems in jurisdictions where prosecutions regularly last nearly as long as—or even longer than—the relevant civil limitations period." *Id.* The Court found "[a] significant number of criminal defendants could face an untenable choice between (1) letting their claims expire and (2) filing a civil suit against the very person who is in the midst of prosecuting them." *Id.* Accordingly, the Court held the plaintiff's fabricated-evidence claim began to run when the criminal proceedings terminated in his favor, not when he acquired the requisite knowledge of when the evidence was used against him, thereby creating an exception to the general discovery rule.

The policy underlying the exception recognized in *McDonough*, however, does not apply here. Filing a NOC is different from filing a fabricated-evidence claim—the first simply puts a defendant on notice of a potential lawsuit and gives the prospective defendants a chance to assess the alleged claims, whereas the second initiates an actual lawsuit challenging the integrity of the proceedings. Thus, the deterrent of "filing a civil suit against the very person who is in the midst of prosecuting" the case is not present; indeed, the reasons for requiring a timely NOC are in part so that the public entity can investigate the claim and possibly reach a settlement before litigation even commences. *See Crum* 922 P.2d at 351. In other words, the policy reasons against forcing defendants to timely sue their prosecutors in the middle of a criminal trial are wholly different from the policy reasons behind filing a timely NOC. The Court therefore finds *McDonough* inapplicable.

Furthermore, Plaintiff Robinette offers no facts suggesting she did not have knowledge of the state law claim allegations prior to V.S.R.'s return. The factual allegations contained in each of her preceding state law counts concern harms that occurred before V.S.R.'s return. For example, in Count 6, Plaintiff Robinette raises allegations regarding "the first ninety (90) days after the children were seized" and "during the first

198 days after V.S.R. was seized" and Defendants' failure "to provide any reunification services until six (6) months after the children were seized." (Doc. 105 at ¶¶ 235, 236, 237). Likewise, in Count 8, Plaintiff Robinette's allegations regarding V.S.R.'s emotional distress occurred in "February 2019, [when] "it was thought V.S.R. would have to be institutionalized." (*Id.* at ¶ 260). Still more, in Count 14, Plaintiff Robinette's civil conspiracy allegations stem from the alleged false representations Defendants made to the juvenile court regarding the Apache Junction Police investigation and Mr. Neeley's alleged sexual abuse of V.S.R. (*Id.* at ¶ 310). While Count 14 does not contain dates, the Court found elsewhere in the Complaint the alleged false statements Defendants made about the police investigation and Mr. Neeley's alleged sexual abuse occurred on or around December 13, 2016, and July 11, 2017, respectively. (*Id.* at ¶¶ 66, 84).

Nowhere in the SAC does Plaintiff Robinette allege she did not realize Defendants committed the alleged harms until after the dependency proceedings ended. To the contrary, Plaintiff Robinette knew about the conduct during those proceedings and knew of the government actors involved. The dependency proceedings did not need to be terminated before Plaintiff Robinette could reasonably assess the appropriateness of Defendants' false statements and omissions in their motions filed in Juvenile Court. Where, as here, there are no facts in dispute regarding the discovery of claims, the Court may dismiss them as untimely.[8] *Humphrey*, 466 P.3d at 375; *see also Scoins v. Goddard*, 2007 WL 2807755, at *5 (D. Ariz. Sept. 25, 2007) (finding plaintiff "realized she had been injured by the defendants as soon as she lost custody of her children" and therefore plaintiff's failure to comply with A.R.S. § 12–821.01 barred plaintiff's state law claims); *Grundemann v. Paradise Valley Unified Sch. Dist. No. 69*, 2012 WL 12950086, at *6 (D. Ariz. Jan. 26, 2012*)* ("[a] plaintiff need not know all the facts underlying a cause of action to trigger accrual but must know that a wrong occurred and caused the injury.").

…

---

[8] Although the Court granted Plaintiffs' unopposed request for a stay (Doc. 37) and ordered them to file their notice of claim on or before June 15, 2020, this does not preclude the Court from finding noncompliance with A.R.S. § 12-821.01(A)'s statutory requirements.

### ii. Filing of Amended Complaint

Plaintiff Robinette also argues she filed her FAC and SAC after the NOC filing on June 15, 2020. (Doc. 113 at 7). Thus, she argues, even if A.R.S. § 12-821.01 requires that notice be served prior to the filing of a complaint, the FAC and the SAC both superseded and replaced the original complaint and were filed after Plaintiff Robinette's NOC. (*Id.*) Regardless, the Court finds this alone does not remedy Plaintiff Robinette's NOC time bar because Plaintiff Robinette failed to file the NOC within 180 days of when the causes of action accrued. Therefore, Plaintiff Robinette's state law claims will be dismissed as to all Defendants.

### D. Plaintiffs' Claims Against DCS

Defendants also seek to dismiss DCS from this action. Defendants raise two arguments regarding DCS. First, Defendants argue DCS is a non-jural entity which cannot be sued and should be dismissed. Second, Defendants argue DCS is not a "person" under § 1983 and is not a "municipality" for the purpose of Plaintiffs' *Monell*-related claims.

### i. DCS Status as Non-Jural Entity

Defendants first argue DCS is a non-jural entity under Arizona law and thus cannot be sued. (Doc. 111 at 7). Plaintiffs raised no arguments in their response that DCS is a distinct legal entity that can be sued under state law, and therefore the Court finds the non-jural status of the agency is undisputed. In Arizona, a plaintiff may sue a government entity only if the state legislature has granted that entity the power to sue or be sued. *Schwartz v. Superior Court*, 925 P.2d 1068, 1070 (Ariz. Ct. App. 1996). The statutory provisions under which the legislature created DCS contain no such powers. *See* A.R.S. §§ 8-451–8-892. Therefore, DCS may not be sued, and the state law claims against it are dismissed with prejudice. *See East v. Arizona*, 2017 WL 6820141, at *2 (D. Ariz. Aug. 23, 2017).

### ii. § 1983 Claims Against DCS

Defendants next argue DCS is a department of the state and not a person within the meaning of § 1983. (Doc. 111 at 8). They assert § 1983 claims may not be brought against state agencies and state officials sued in their official capacities. (*Id.*) They further allege

- 13 -

Plaintiffs' *Monell* claims are groundless because DCS is not a "municipality" or "local governing body." (*Id.* at 9). The Court agrees.

Under § 1983, "[e]very *person* who, under color of [law] . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured." 42 U.S.C. § 1983 (emphasis added). The Supreme Court has ruled, however, that a lawsuit against a state official acting in his or her official capacity is "a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). A state or state agency is not a "person" within the meaning of § 1983 and therefore is not subject to money damages in lawsuits alleging § 1983 violations. *Id.* at 58.

Plaintiffs argue DCS is a local governing body, which executed a policy that inflicted the injury alleged in the SAC. (Doc. 113 at 8). They argue under *Monell* "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[,] that the government as an entity is responsible under § 1983." (*Id.*) Thus, they allege since DCS inflicted the injury alleged in the SAC, DCS is accordingly "an entity [that] is responsible under § 1983." (*Id.*)

The Court finds DCS is not a "person" under § 1983 because it is not a "local governing body" under *Monell*.[9] The cases Plaintiffs provide point only to "municipal liability." In *Monell*, the court examined the legislative history and found no justification for excluding municipalities from "persons" under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 660 (1978). DCS, however, is a state agency, not a municipality. *Monell* is therefore inapposite. Plaintiffs also provided no case law holding a state governmental agency constitutes a "local governing body." (Doc. 115 at 4).

Plaintiffs further argue that DCS is liable under § 1983 because it acted according to a policy, practice, or custom that caused the deprivation of Plaintiff's constitutional

---

[9] Regardless of whether DCS waived its Eleventh Amendment immunity when it removed this case from state court to federal court, the Court finds it is not a "local governing body" and therefore cannot be sued under *Monell*. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 660 (1978).

rights. (Doc. 113 at 8). The policy, practice, or custom inquiry, however, is relevant only where the plaintiff in a § 1983 lawsuit attempts to hold a *municipality* liable for the actions of one of its officials. *Monell*, 436 U.S. at 660. The Court rejects Plaintiff's argument because DCS is not a municipality. *Will*, 491 U.S. at 58 (holding that a state or state agency is not a "person" under § 1983). Furthermore, Plaintiffs seek only money damages against DCS. Therefore, all the claims against DCS constitute "a suit against the State itself" and, because a state is not a § 1983 "person," all such claims are dismissed. *Id.* at 59.

**IV.     Conclusion**

The Court will dismiss Counts 5–10, and 14 of Plaintiff Robinette's SAC for failure to comply with A.R.S. § 12-820.01. The Court will dismiss the state law claims against DCS because DCS is a non-jural entity and may not be sued. The Court will also dismiss the *Monell*-related claims (Count 13) against DCS because DCS is not a person under § 1983. Finally, as the state law causes of action accrued more than 180 days ago, the Court will deny Plaintiff's request for leave to amend because such amendments would be futile. *See Lopez*, 203 F.3d at 1127-30.

Therefore, the only remaining claims for Plaintiff Robinette are: Counts 1–4, 11, and 12, which involve claims for 42 U.S.C. §1983 violations; and Count 15, which involves a civil conspiracy claim under 42 U.S.C. § 1985(3).

Accordingly,

**IT IS HEREBY ORDERED** that State Defendants' Motion to Dismiss Plaintiff Robinette's state law claims (Doc. 111) is **granted** as to Counts 5–10, and 14.

**IT IS FURTHER ORDERED** that Counts 5–10, and 14, brought by the parents of minor Plaintiffs A.L.N. and A.R.N. are **dismissed** because Plaintiffs conceded that the time to file a NOC for their state law claims for damages resulting from minor Plaintiffs A.L.N. and A.R.N.'s removals has expired. (Doc. 33 at 3).

**IT IS FURTHER ORDERED** that Plaintiffs' *Monell*-related claims (Count 13) are **dismissed** against DCS because DCS is not a person under § 1983.

…

**IT IS FINALLY ORDERED** that the Arizona Department of Child Safety ("DCS") **is dismissed with prejudice** as a defendant from this action.

Dated this 5th day of January, 2022.

_____
Honorable Diane J. Humetewa
United States District Judge